UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

FLORENCE APPLEMAN,

      Plaintiff,

v.

CELEBRITY CRUISES, INC.

      Defendant.

_____/

## COMPLAINT AND REQUEST FOR ADVISORY JURY

Plaintiff sues Defendant and alleges:

## THE PARTIES

1. Plaintiff, FLORENCE APPLEMAN is a resident of Florida.

2. Defendant, CELEBRITY CRUISES, INC. (hereinafter referred to as "Celebrity"), is a for-profit foreign corporation with its principal place of business in Miami, Florida.  Celebrity is authorized to conduct and is conducting business in the State of Florida. Celebrity has consented to jurisdiction and venue in this forum in its contract of carriage.

3. At all times material, Celebrity is a common carrier engaged in the business of marketing, selling and operating a cruise line out of various ports within the continental United States, including Miami, Florida.  Celebrity derives substantial revenues from cruises originating and terminating in various ports in the State of Florida, including Miami-Dade County, Florida.

4. At all times material, Celebrity owned, managed, operated, maintained, supervised and/or controlled, or was the owner *pro hac vice* and/or charterer of the ocean-going passenger vessel known as the *Celebrity Equinox.*

5. At all times material, Celebrity employed and/or contracted with the vessel's doctors and nurses ("Medical Staff") to work as the ship's doctors and nurses aboard the *Celebrity Equinox*.

## JURISDICTION AND VENUE

6. This matter falls under the admiralty and maritime jurisdiction of this Court.

7. This action is being pursued in this Court, as opposed to state court as otherwise allowed by the Saving to Suitors Clause of 28 U.S.C. §1333 because Celebrity unilaterally inserts a forum clause into its cruise tickets that requires its passengers to file cruise-related suits *only in this Federal District and Division,* as opposed to any other place in the world.

8. Celebrity, at all material times, personally or through an agent:

    a. Operated, conducted, engaged in or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

    b. Was engaged in substantial activity within this state;

    c. Operated vessels in the waters of this State;

    d. Committed one or more of the acts stated in Florida Statutes §§ 48.081, 48.181 or 48.193; and/or;

    e. The acts of Celebrity set out in this Complaint occurred in whole or in part in this county and/or state.

9. Defendant is subject to the jurisdiction of the Courts of this State.

10. The causes of action asserted in this Complaint arise under the General Maritime Law of the United States.

## GENERAL ALLEGATIONS

11. Celebrity, as a common carrier, was engaged in the business of providing to the public, and to the Plaintiff in particular, for compensation, vacation cruises aboard the vessel, *Celebrity Equinox*.

12. As part of providing vacation cruises, Celebrity advertised, marketed and promoted that a

competent physician and ship's medical center are available in the event passengers need medical care for customary charges[1].  Celebrity further advertised, marketed and promoted that as a member of Cruise Line International Association, and it had adopted the Cruise Industry Passenger Bill of Rights which guarantees its passengers, including the Plaintiff, the right to have "full-time, professional emergency medical attention."[2]

13. Celebrity employed and/or contracted with and/or provided the Medical Staff on board the vessel in connection with its operation of the vessel as part of Celebrity's business of operating cruise ships and not solely for the convenience of passengers.

14. At all times material, the Celebrity relied upon and directed the Medical Staff to perform specified duties to assist them in complying with its regulatory duties and obligations, including but not limited to those set forth by the U.S. Public Health Service, Drug Enforcement Agency, Coast Guard and Center for Disease Control. Celebrity also relied upon and directed Medical Staff to fulfill the requirements of the vessel's flag state, to carry a licensed physician as well as those of the United States under both the Cruise Vessel Safety and Security Act, and the general maritime requirement of maintenance and cure owed to its seamen operating the vessel.

15. At all material times, Celebrity charged money to passengers for the medical services it provided.  Thereby, Celebrity is in the business of providing medical services to passengers for profit, and/or Celebrity is in the business of operating a floating hospital for their own profit. Herein, Celebrity charged Plaintiff a fee for the medical treatment performed by the Medical Staff aboard its vessel and for the medicine provided to the Plaintiff. All of the charges for the medical

---

[1] https://www.celebritycruises.com/company/customer-support/help-and-faqs/during-your-cruise/all-during-your-cruise-faqs
[2] https://www.celebritycruises.com/company/customer-support/bill-of-rights

treatment and medicine were charged directly to Plaintiff's onboard credit program (or the equivalent shipboard credit card) linked to Celebrity.

16. Overall, Celebrity is in the business of providing medical care. Like other amenities offered aboard its vessels, Celebrity also offers to passengers modern medical facilities onboard its ships for profit. *See, Franza v. Royal Caribbean Cruises, Ltd*., 772 F.3d 1225, 1244 n. 14 (11th Cir. 2014)

17. At all times material hereto, Celebrity owned, operated, managed, maintained and/or controlled the medical equipment in the ship's medical center aboard the vessel *Celebrity Equinox*.

18. At all times material hereto, Celebrity had the ability to monitor and control each and every step taken by any crewmember (including the Medical Staff) working in the medical department via telephone, videoconference, Skype or otherwise. This technology is generally referred to as "Face to Face Telemedicine." Such modern means of communication make the location of the cruise ship effectively irrelevant and allows Celebrity to directly control the medical care on the ship.

19. At all times material hereto, Celebrity had control and/or the right to control any and all crewmembers working in Celebrity's medical department, including the Medical Staff.

20. At all times material hereto, the Medical Staff were in the regular, full-time employment of the ship, as salaried member(s) of the crew, subject to the ship's discipline and the Master's orders, and also under the control of Celebrity's shoreside medical department located in Miami, Florida, through modern means of communication such as "Face to Face Telemedicine."

21. At all times material hereto, Celebrity had the right to fire the Medical Staff.

22. At all times material hereto, Celebrity was responsible for, and liable for, the actions of the Medical Staff with respect to treatment, or lack of treatment, of the Plaintiff based on a theory of

*respondeat superior* and/or under the principle of actual and/or apparent agency.

23. At all times material hereto, the Medical Staff were direct employees and/or actual agents and/or apparent agents of Celebrity, and at all times acted within the course and scope of their employment and/or agency agreement and/or relationship.

24. At all times material hereto, the Medical Staff were represented to the Plaintiff and the ship's passengers as employees of Celebrity in that:

   a. They worked in the ship's medical center aboard the vessel, which was owned and/or operated by Celebrity;

   b. They wore a ship's uniform provided by Celebrity;

   c. They represented themselves as the "ship's medical crew" to the Plaintiff;

   d. The ship's doctors were called ship's officer(s) by Celebrity, the ship's officers and the crew;

   e. They ate with the ship's crew;

   f. They were under the commands of the ship's officers and followed all of the master's rules and regulations;

   g. Their charges for medical treatment and medicine were charged directly to passenger's onboard credit program (or the equivalent shipboard credit card) linked to Celebrity;

   h. They communicated directly with Celebrity (to the captain and to unknown persons in Celebrity's shoreside office) while providing treatment to the Plaintiff;

   i. The literature provided by Celebrity and its representatives showed the doctor(s) and nurse(s) as crewmembers and employees of Celebrity;

   j. There were Celebrity insignias in various places inside the ship's medical center where the Medical Staff worked;

   k. They were employed full-time by Celebrity;

   l. They were paid a salary by Celebrity; and/or

   m. They spoke to the Plaintiff as though they had authority to do so by Celebrity.

25. At no time did Celebrity represent to the Plaintiff in particular, or the ship's passengers in general,

in any meaningful way, that the Medical Staff were not agents or employees of Celebrity.

26. The Plaintiff reasonably relied on the representation of Celebrity that the Medical Staff were employed by Celebrity and that the vessel had a medical center staffed to provide passengers with "full-time, professional emergency medical attention" as guaranteed in the Passenger Bill Rights adopted by Celebrity. This reliance was detrimental because it resulted in the Plaintiff deciding to book and participate in the cruise, presenting to the infirmary and receiving improper and/or substandard medical treatment. Had the Plaintiff not detrimentally relied on the representations of Celebrity and the negligent medical treatment given by the Medical Staff, Plaintiff would not have been injured.

27. At all times material hereto, Celebrity knew of the Medical Staff's agency representations and allowed them to represent themselves as such.

## THE INCIDENT

28. On or about January 5, 2017, Plaintiff was a paying passenger aboard the *Celebrity Equinox*, which departed from Miami, Florida.

29. On or about December 9, 2017, Plaintiff became injured in a restroom aboard the *Celebrity Equinox* and was taken to the ship's medical center in a wheelchair after experiencing terrible pain in her groin, hip area.

30. At the time she first presented to the infirmary, Plaintiff specifically advised the Medical Staff of her pre-existing medical conditions, including the fact that she had a previous hip replacement. Despite the Medical Staff's knowledge of Plaintiff's pre-existing condition, the Medical Staff mismanaged and failed to properly treat the Plaintiff's condition and symptoms, and provided medical care which fell below the standard of care.

31. The Medical Staff initially diagnosed the Plaintiff with right hip pain and unspecified internal

derangement of the right knee and upper abdominal pain after conducting only an X-ray of her right knee. She was given pain medication which masked her symptoms. Even though the Plaintiff had excruciating pain in her groin and hip area, the Medical Staff discharged her to return to her room without performing an an X-ray of her hip and monitoring her condition.

32. After the Medical Staff failed to properly conduct a thorough and complete examination, Plaintiff improperly and prematurely discharged to return to her cabin.  However, on January 10, 2019, her condition worsened and Plaintiff returned to the medical facility for a second time where she was diagnosed with hip pain.  Trusting and relying on the expertise of the Medical Staff, Plaintiff anticipated additional X-rays, testing, and/or treatment but instead she was once again returned to her cabin in a wheelchair without a thorough and complete examination.

33. Plaintiff's condition continued to deteriorate and she was unable to ambulate and as a result she urinated and defecated in her cabin bed. On January 11, 2019, the travel companion called the infirmary and spoke with a crewmember who identified themselves as a nurse and part of the Medical Staff.  The travel companion explained the deterioration in Plaintiff's condition and requested immediate medical assistance. The nurse went to Plaintiff's cabin and returned to the medical facility with the Plaintiff in a wheelchair.  Although she trusted and relied on the expertise of the Medical Staff, Plaintiff still did not get X-rays of the hip.   Despite her deteriorating condition, the Medical Staff delayed in contacting a shoreside specialist for consultation.

34. On January 11, 2019, Plaintiff was finally medically disembarked in the Bahamas due to swelling and hip pain.  At the shoreside hospital, X-rays of Plaintiff's hip were taken which revealed she suffered a traumatic hip dislocation.  She underwent a reduction under sedation

after which Plaintiff was then transported to JFK Hospital in Florida, where she was also diagnosed with a bladder infection and E. coli infection.

35. Overall, the treatment that the Plaintiff received aboard the *Celebrity Equinox* fell below the standard of care, was mismanaged, inadequate and/or unreasonably delayed. All of which directly led to the worsening of the Plaintiff's medical condition.

36. As a result of Plaintiff's injuries, Plaintiff was in rehabilitation for a month and had her hip replacement adjusted through surgery and developed a bladder infection and E.coli infection.

## COUNT I - VICARIOUS LIABILITY AGAINST CELEBRITY FOR MEDICAL NEGLIGENCE BASED ON *RESPONDEAT SUPERIOR*

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-six (36) as though alleged originally herein.

37. At all times material hereto, Celebrity owned, operated, controlled, and/or maintained the medical center aboard the *Celebrity Equinox*, and was responsible for overseeing the operations of the shipboard medical center including the selecting, purchasing, and maintaining of the medical equipment and medications contained therein; recruitment, credentialing and staffing of shipboard medical centers with physicians and nurses; evaluations, training and coaching of shipboard physicians; and acting as a resource to the shipboard medical personnel and providing guidance and instruction in the event of a medical emergency in said medical center.

38. At all times material, the Medical Staff were the ship's doctors and nurses aboard the vessel *Celebrity Equinox*.

39. At all times material, the Medical Staff were employees of Celebrity which was therefore vicariously liable for the negligent treatment of Plaintiff under the legal principles under *respondeat superior* and the principles set forth in *Franza v. Royal Caribbean Cruise Ltd.*, 772

F.3d 1225 (11th Cir. 2014).

40. At all times material hereto, Medical Staff were in the regular, full-time employment of the ship, as a salaried member of the crew, were identified as officers of the vessel, subject to the ship's discipline and the Master's orders, and also under the control of Celebrity shoreside medical department, Medical Director and Medical Officer located in Miami, Florida through modern means of communication such as "Face-to-Face Telemedicine."

41. At all times material, Celebrity acknowledged that the Medical Staff would act on Celebrity's behalf, and all of the Medical Staff accepted the undertaking.

42. At all times material hereto, Celebrity controlled and/or maintained the right of control over the Medical Staff and other medical personnel working in its medical center in the exercise of their job duties, including the treatment of patients. Celebrity exercised such control and/or right of control in many different ways, including, but not limited to the following:

   a. Setting the standards, criteria, and procedures for selecting and hiring said personnel;

   b. Credentialing, evaluating, training, and coaching shipboard medical personnel;

   c. Acting as a resource to the shipboard medical personnel, and providing guidance and instruction in the event of a medical emergency;

   d. Establishing, adopting, and enforcing rules, regulations and protocols for the treatment of patients at its medical center;

   e. Maintaining and/or exercising the right to both hire and fire said personnel;

   f. Establishing the amount, method, and manner of payment for said personnel;

   g. Paying a salary, bonus and benefits to said personnel;

   h. Establishing and enforcing the terms of employment for such personnel, including their hours, job duties and the details of their work;

   i. Setting the standards and criteria to determine which patients were to be treated by said personnel;

j. Determining and setting the specific charges for treatment for its passengers and requiring that all such charges be paid directly to Defendant on the passenger's shipboard charge card;

k. Supplying the tools, workplace and equipment for said personnel to perform their job duties;

l. Determining and selecting the medications, drugs, and supplies to be used in the ship's medical center; purchasing said medications, drugs and supplies to stock the medical center; setting the prices for the use and or sale of such medications, drugs and supplies to passengers and requiring the passengers to pay it directly for such medical, drugs and supplies on their shipboard charge cards;

m. Advertising the existence of the medical center as part of its marketing campaigns in order to attract passengers;

n. Treating said personnel as members of its crew, subject to the vessel's rules and regulations and the authority of its officers and requiring them to carry out crew functions and wear crew uniforms;

o. Requiring said personnel to take specific courses and training, including those offered by the Defendant;

p. Agreeing to staff, equip and operate the medical facilities and the provision of medical services therein under the industry Guidelines issued by the American College of Emergency Physicians and requiring its medical personnel to practice medicine and treat patients in accordance with the requirements of said Guidelines;

q. Through the use of its shoreside medical department, which is staffed with various doctors and other medical personnel that can communicate with its ships literally anywhere in the world electronically;

r. By entering into contracts with various land based hospitals, such as the Cleveland Clinic and/or Jackson Memorial Hospital to provide medical expertise and requiring their shipboard medical personnel to utilize such services in the treatment of passengers and crew in specified situations;

s. Through the use of electronic technology, including video-conferencing and tele-medicine with their shoreside medical department and hospital contract providers to control the treatment provided;

t. By requiring the Medical Staff to supervise staff and other personnel working in its medical center; and

u. In other manners that are expected to be determined in continuing discovery and investigation.

43. CELEBRITY is vicariously liable under the principles of *respondeat superior,* for the acts and omissions of its employees, servants, actual agents, ostensible agents, and/or representatives, including but not limited to the Medical Staff, and breached its duty to exercise reasonable care under the circumstances owed to the Plaintiff as follows:

    a. Failing to properly conduct a comprehensive work-up when the Plaintiff first presented to the infirmary;

    b. Failing to properly take into account the Plaintiff's prior medical history and procedures, including but not limited to previous hip replacement when evaluating and treating Plaintiff;

    c. Failing to consider and explore other potential diagnoses given Plaintiff's symptoms and comorbidities;

    d. Failing to establish a differential diagnosis(es) given the Plaintiff's multiple comorbidities, symptoms and conditions;

    e. Failing to keep the Plaintiff in the infirmary for proper monitoring given her symptoms and comorbidities;

    f. Failing to proactively treat the Plaintiff with antibiotics and other medications in light of the Plaintiff's multiple comorbidities, symptoms and conditions;

    g. Failing to perform hip and/or pelvic X-rays to properly monitor, diagnose and treat the Plaintiff's conditions and symptoms;

    h. Failing to perform serial evaluations to properly monitor, diagnose and treat the Plaintiff's conditions and symptoms;

    i. Failing to recognize and appreciate the seriousness and gravity of the Plaintiff's condition when she first presented given her symptoms and comorbidities;

    j. Negligently and prematurely discharging the Plaintiff from the infirmary with unstable hip function;

    k. Negligently administering pain medication to mask the Plaintiff's symptoms and discharging her with no real appreciation for the precipitating pathology;

    l. Failing to recognize the seriousness of and respond to the Plaintiff's deteriorating condition during the course of her stay after the injury;

m.  Failing to recognize that the Plaintiff's inability to ambulate would and in fact did lead to her laying in her own feces and urine resulting in a bladder infection and E. coli;

n.  Failing to monitor Plaintiff's condition to ensure she was properly assisted to prevent bladder infection and E. coli;

o.  Negligently telling the Plaintiff to return to her room without reasonable care from the medical facility;

p.  Negligently delaying consultation with an appropriate shoreside specialist(s) when the Plaintiff presented to the medical center in severe pain;

q.  Failing to timely obtain shoreside consultation with the appropriate medical expert(s) when the Plaintiff presented to the medical center in severe pain;

r.  Negligent supervision of the Medical Staff wherein the duty nurse dismissed the Plaintiff's concerns and instructed her to return to her cabin causing delay in treatment;

s.  Failing to provide competent medical staff capable of providing "full-time professional emergency medical attention" as advertised and guaranteed on Celebrity's website and as set forth in the Passenger Bill of Rights adopted by Celebrity;

t.  Failure to promptly provide Plaintiff with timely, proper and/or adequate medical care and attention;

u.  Failure to timely and/or properly assess and diagnosis Plaintiff and identify emergent, urgent condition of the Plaintiff in a timely manner, in order to facilitate optimum levels of health care;

v.  Failure to understand and react effectively to Plaintiff's medical needs given her symptoms to perform accurate and ongoing assessments of Plaintiff's condition;

w.  Failure to practice medicine according to generally accepted standards of care;

x.  Failure to adhere and refer to Celebrity's policies and procedures;

y.  Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines;

z.  A breach of the prevailing professional standard of care for said health care providers, to wit: that level of care, skill and treatment which, in light of all relevant surrounding circumstances as recognized as acceptable and appropriate by a reasonably prudent similar health care provider;

aa. In other manners expected to be discovered during the course of ongoing investigation and discovery.

44. As a direct and proximate result of the negligence of the Medical Staff, as described above, for which Celebrity is vicariously liable, the Plaintiff was unable to obtain the prompt, timely, proper and adequate medical care she required resulting in devastating injuries. Had the Plaintiff received the appropriate care and treatment from the Medical Staff, it is more likely than not she would not have developed a bladder infection, E. coli infection, and required extensive medical care and rehabilitation.

45. As a direct and proximate result of the negligence of the Medical Staff, as described above, for which Celebrity is vicariously liable, the Plaintiff was injured in and about her body and extremities, including severe physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, disability, impairment, loss of past earnings and impairment of her future working ability and earning capacity, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions. All of these damages are permanent and continuing in nature.

46. As a direct and proximate result of the negligence of the Medical Staff, as described above, for which Celebrity is vicariously liable, the Plaintiff incurred medical expenses in the past and will continue to incur such expenses in the future. Plaintiff also lost the money paid for the cruise, incurred extra expenses such as transportation and had the enjoyment of the cruise ruined or damaged.

WHEREFORE, the Plaintiff, FLORENCE APPLEMAN, demands judgment against Defendant Celebrity for damages, as well as post-judgment interest to the extent allowed by law, attorneys' fees and costs as may be allowed by law, and requests an advisory jury under Federal Rule of Civil Procedure 39, as well as any further relief as this Court deems just and appropriate.

## COUNT II
## VICARIOUS LIABILITY AGAINST CELEBRITY FOR MEDICAL
## NEGLIGENCE BASED ON ACTUAL AGENCY

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through thirty-six (36) as though alleged originally herein.

47. At all times material hereto, Celebrity owned, operated, controlled, and/or maintained the medical center aboard the *Celebrity Equinox*, and was responsible for overseeing the operations of the shipboard medical center including the selecting, purchasing, and maintaining of the medical equipment and medications contained therein; recruitment, credentialing and staffing of shipboard medical centers with physicians and nurses; evaluations, training and coaching of shipboard physicians; and acting as a resource to the shipboard medical personnel and providing guidance and instruction in the event of a medical emergency in said medical center.

48. At all times material hereto, Celebrity controlled and/or maintained the right of control over the Medical Staff and other medical personnel working in its medical center in the exercise of their job duties, including the treatment of patients. Celebrity exercised such control and/or right of control in many different ways, including, but not limited to the following:

  a. Setting the standards, criteria and procedures for selecting and hiring said personnel;

  b. Credentialing, evaluating, training and coaching shipboard medical personnel;

  c. Acting as a resource to the shipboard medical personnel and providing guidance and instruction in the event of a medical emergency;

  d. Establishing, adopting and enforcing rules, regulations and protocols for the treatment of patients at its medical center;

  e. Maintaining and/or exercising the right to both hire and fire said personnel;

  f. Establishing the amount, method and manner of payment for said personnel;

g. Paying a salary, bonus and benefits to said personnel;

h. Establishing and enforcing the terms of employment for such personnel, including their hours, job duties and the details of their work;

i. Setting the standards and criteria to determine which patients were to be treated by said personnel;

j. Determining and setting the specific charges for treatment for its passengers and requiring that all such charges be paid directly to Defendant on the passenger's shipboard charge card;

k. Supplying the tools, workplace and equipment for said personnel to perform their job duties;

l. Determining and selecting the medications, drugs and supplies to be used in the ship's medical center; purchasing said medications, drugs and supplies to stock the medical center; setting the prices for the use and or sale of such medications, drugs and supplies to passengers and requiring the passengers to pay it directly for such medical, drugs and supplies on their shipboard charge cards;

m. Advertising the existence of the medical center as part of its marketing campaigns in order to attract passengers;

n. Treating said personnel as members of its crew, subject to the vessel's rules and regulations and the authority of its officers and requiring them to carry out crew functions and wear crew uniforms;

o. Requiring said personnel to take specific courses and training, including those offered by the Defendant;

p. Agreeing to staff, equip and operate the medical facilities and the provision of medical services therein under the industry Guidelines issued by the American College of Emergency Physicians and requiring its medical personnel to practice medicine and treat patients in accordance with the requirements of said Guidelines;

q. Through the use of its shoreside medical department, which is staffed with various doctors and other medical personnel that can communicate with its ships literally anywhere in the world electronically;

r. By entering into contracts with various land based hospitals, such as the Cleveland Clinic and/or Jackson Memorial Hospital to provide medical expertise and requiring their shipboard medical personnel to utilize such services in the treatment of passengers and crew in specified situations;

    s. Through the use of electronic technology, including video-conferencing and tele-medicine with their shoreside medical department and hospital contract providers to control the treatment provided;

    t. By requiring the Medical Staff to supervise staff and other personnel working in its medical center; and

    u. In other manners that are expected to be determined in continuing discovery and investigation.

49. At all times material, the Celebrity also relied upon and directed the Medical Defendants and the other personnel in their medical center to perform specified duties to assist them in complying with its regulatory duties and obligations, including but not limited to those set forth by the U.S. Public Health Service, Drug Enforcement Agency, Coast Guard and Center for Disease Control. Celebrity also relied upon and directed Medical Defendants to fulfill the requirements of the vessel's flag state, to carry a licensed physician as well as those of the United States under both the Cruise Vessel Safety and Security Act, and the general maritime requirement of maintenance and cure owed to its seamen operating the vessel.

50. At all times material, the Medical Staff were the ship's doctors and nurse aboard the vessel *Celebrity Equinox.*

51. At all times material, the Medical Staff were the actual agents, apparent agents, servants, and/or employees of CELEBRITY which was therefore vicariously liable for the negligent treatment of Plaintiff under the legal principles set forth in *Franza v. Royal Caribbean Cruise Ltd.*, 772 F.3d 1225 (11th Cir. 2014).

52. At all times material hereto, Medical Staff were in the regular, full-time employment of the ship, as a salaried member of the crew, were identified as officers of the vessel, subject to the ship's discipline and the Master's orders, and also under the control of Celebrity shoreside medical department, Medical Director and Medical Officer located in Miami, Florida through

modern means of communication such as "Face-to-Face Telemedicine."

53. At all times material, Celebrity acknowledged that the Medical Staff would act on Celebrity's behalf, and all of the Medical Staff accepted the undertaking.

54. Celebrity, is vicariously liable under the principles of agency for the acts and omissions of its employees, servants, actual agents, ostensible agents, and/or representatives, including but not limited to the Medical Staff, and breached its duty to exercise reasonable care under the circumstances owed to the Plaintiff as follows:

   a. Failing to properly conduct a comprehensive work-up when the Plaintiff first presented to the infirmary;

   b. Failing to properly take into account the Plaintiff's prior medical history and procedures, including but not limited to previous hip replacement when evaluating and treating Plaintiff;

   c. Failing to consider and explore other potential diagnoses given Plaintiff's symptoms and comorbidities;

   d. Failing to establish a differential diagnosis(es) given the Plaintiff's multiple comorbidities, symptoms and conditions;

   e. Failing to keep the Plaintiff in the infirmary for proper monitoring given her symptoms and comorbidities;

   f. Failing to proactively treat the Plaintiff with antibiotics and other medications in light of the Plaintiff's multiple comorbidities, symptoms and conditions;

   g. Failing to perform hip and/or pelvic X-rays to properly monitor, diagnose and treat the Plaintiff's conditions and symptoms;

   h. Failing to perform serial evaluations to properly monitor, diagnose and treat the Plaintiff's conditions and symptoms;

   i. Failing to recognize and appreciate the seriousness and gravity of the Plaintiff's condition when she first presented given her symptoms and comorbidities;

   j. Negligently and prematurely discharging the Plaintiff from the infirmary with unstable hip function;

   k. Negligently administering pain medication to mask the Plaintiff's symptoms and

discharging her with no real appreciation for the precipitating pathology;

l.  Failing to recognize the seriousness of and respond to the Plaintiff's deteriorating condition during the course of her stay after the injury;

m.  Failing to recognize that the Plaintiff's inability to ambulate would and in fact did lead to her laying in her own feces and urine resulting in a bladder infection and E. coli;

n.  Failing to monitor Plaintiff's condition to ensure she was properly assisted to prevent bladder infection and E. coli;

o.  Negligently telling the Plaintiff to return to her room without reasonable care from the medical facility;

p.  Negligently delaying consultation with an appropriate shoreside specialist(s) when the Plaintiff presented to the medical center in severe pain;

q.  Failing to timely obtain shoreside consultation with the appropriate medical expert(s) when the Plaintiff presented to the medical center in severe pain;

r.  Negligent supervision of the Medical Staff wherein the duty nurse dismissed the Plaintiff's concerns and instructed her to return to her cabin causing delay in treatment;

s.  Failing to provide competent medical staff capable of providing "full-time professional emergency medical attention" as advertised and guaranteed on Celebrity's website and as set forth in the Passenger Bill of Rights adopted by Celebrity;

t.  Failure to promptly provide Plaintiff with timely, proper and/or adequate medical care and attention;

u.  Failure to timely and/or properly assess and diagnosis Plaintiff and identify emergent, urgent condition of the Plaintiff in a timely manner, in order to facilitate optimum levels of health care;

v.  Failure to understand and react effectively to Plaintiff's medical needs given her symptoms to perform accurate and ongoing assessments of Plaintiff's condition;

w.  Failure to practice medicine according to generally accepted standards of care;

x.  Failure to adhere and refer to Celebrity's policies and procedures;

y.  Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines;

z.  A breach of the prevailing professional standard of care for said health care providers, to wit: that level of care, skill and treatment which, in light of all relevant surrounding circumstances

as recognized as acceptable and appropriate by a reasonably prudent similar health care provider;

aa. In other manners expected to be discovered during the course of ongoing investigation and discovery.

55. As a direct and proximate result of the negligence of the Medical Staff, as described above, for which Celebrity is vicariously liable, the Plaintiff was unable to obtain the prompt, timely, proper and adequate medical care she required resulting in devastating injuries. Had the Plaintiff received the appropriate care and treatment from the Medical Staff, it is more likely than not she would not have developed a bladder infection, E. coli, and extensive medical care and rehabilitation.

56. As a direct and proximate result of the negligence of the Medical Staff, as described above, for which Celebrity is vicariously liable, the Plaintiff was injured in and about her body and extremities, including severe physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, disability, impairment, loss of past earnings and impairment of her future working ability and earning capacity, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions. All of these damages are permanent and continuing in nature.

57. As a direct and proximate result of the negligence of the Medical Staff, as described above, for which Celebrity is vicariously liable, the Plaintiff incurred medical expenses in the past and will continue to incur such expenses in the future. Plaintiff also lost the money paid for the cruise, incurred extra expenses such as transportation and had the enjoyment of the cruise ruined or damaged.

WHEREFORE, the Plaintiff, FLORENCE APPLEMAN, demands judgment against Defendant Celebrity for damages, as well as post-judgment interest to the extent allowed by law,

attorneys' fees and costs as may be allowed by law, and requests an advisory jury under Federal

Rule of Civil Procedure 39, as well as any further relief as this Court deems just and appropriate.

## COUNT III - VICARIOUS LIABILITY AGAINST CELEBRITY
## FOR MEDICAL NEGLIGENCE BASED ON APPARENT AGENCY

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one

(1) through thirty-six (36) as though alleged originally herein.

58. At all times material, Celebrity held out its medical staff, including its doctors and nurses, as

being its employees who work in the Defendant's "medical centers" on the vessel. Celebrity

promotes its medical staff and represents them as being its employees through brochures,

internet advertising, and on the vessel. Celebrity held out its staff, including the Medical Staff

as being direct employees or its actual agents.

59. Celebrity promotes the idea that the medical staff who work in its "medical centers" are

employed by Celebrity as part of a marketing tool to induce passengers, such as the Plaintiff,

to buy cruises on its ships, particularly because the cruise line goes to various foreign ports

that may not have adequate medical care.

60. Celebrity manifested to the Plaintiff in this case that its Medical Staff, were acting as its

employees and/or actual agents in various ways, including but not limited to the following:

   a. The doctors and nurses worked at what Celebrity describes in its advertising as its
      "medical centers";

   b. The "medical centers" are owned and operated by Celebrity, which pays to stock the
      "medical centers" with all supplies, various medicines and equipment;

   c. The passenger is billed directly by Celebrity through the passengers' Sail Card, whereas
      the "medical staff," including the doctor and nurse, are paid salaries and commission by
      Celebrity to work in the "medical centers";

   d. Medical records and forms, including Passenger Shipboard Statements which are given to
      guests in the medical center, used Celebrity's letterhead and logo;

e.  That the medical staff were given uniforms to wear that include name tags, and which have Celebrity's name and logo and were required by Celebrity to be worn by the Medical Staff;

f.  That the Medical Staff are considered to be Officers on board the vessel and a member of the crew, and were introduced to the passengers as Ship's Officers and members of the crew;

g.  That Celebrity put the ship's physician and nurse under the command of the ship's superior officers, including the Master of the ship;

h.  That Celebrity requires the Medical Staff to provide services in the ship's "medical center," which is identified as Celebrity's facility, and when Plaintiff went to the ship's medical center to be seen for her condition, she detrimentally relied upon the representations that it was owned and operated by Celebrity and staffed with doctors and nurses, who had been selected and vetted by Celebrity.  Plaintiff would not have authorized the Medical Staff to treat him if they had known that the Medical Staff were not employees of Celebrity;

i.  There were Celebrity's insignias and logos in various locations throughout the medical center; and/or

j.  The Medical Staff spoke to the Plaintiff as though they had the authority to do so on behalf of Celebrity.

61. At no time did Celebrity represent to the Plaintiff in particular, or the ship's passengers in general, in any meaningful way that the Medical Staff were not agents or employees of Celebrity.

62. Celebrity is estopped to deny that the Medical Staff were its apparent agent and/or apparent employees and/or apparent servants.

63. At all times material, Plaintiff detrimentally relied upon the above described representations of Celebrity by purchasing and participating in the subject cruise and by seeking and following the medical advice and accepting the treatment provided by Medical Staff, reasonably believing that because it was owned and operated by Celebrity, the Medical Staff were its employees and had been properly vetted, selected and trained and were well-qualified doctors and nurses.

64. At all times material hereto, the Plaintiff relied upon the above described representations of Celebrity, which gave rise to her reasonable belief that the Medical Staff in the medical center were its agents and/or employees, which induced their reliance upon such appearance of agency and accordingly, Celebrity is vicariously liable for the negligence of its apparent agents in treating Plaintiff and set forth above incorporated herein by reference under the principles of apparent agency set forth in *Franza v. Royal Caribbean Cruise Ltd.*, 772 F.3d 1225 (11th Cir. 2014).

65. Celebrity is vicariously liable under the principles of apparent agency for the acts and omissions of its apparent agents, servants, and employees, including but not limited to the Medical Staff, and breached its duty to exercise reasonable care under the circumstances owed to the Plaintiff as follows:

   a. Failing to properly conduct a comprehensive work-up when the Plaintiff first presented to the infirmary;

   b. Failing to properly take into account the Plaintiff's prior medical history and procedures, including but not limited to previous hip replacement when evaluating and treating Plaintiff;

   c. Failing to consider and explore other potential diagnoses given Plaintiff's symptoms and comorbidities;

   d. Failing to establish a differential diagnosis(es) given the Plaintiff's multiple comorbidities, symptoms and conditions;

   e. Failing to keep the Plaintiff in the infirmary for proper monitoring given her symptoms and comorbidities;

   f. Failing to proactively treat the Plaintiff with antibiotics and other medications in light of the Plaintiff's multiple comorbidities, symptoms and conditions;

   g. Failing to perform hip and/or pelvic X-rays to properly monitor, diagnose and treat the Plaintiff's conditions and symptoms;

   h. Failing to perform serial evaluations to properly monitor, diagnose and treat the Plaintiff's conditions and symptoms;

i.   Failing to recognize and appreciate the seriousness and gravity of the Plaintiff's condition when she first presented given her symptoms and comorbidities;

j.   Negligently and prematurely discharging the Plaintiff from the infirmary with unstable hip function;

k.   Negligently administering pain medication to mask the Plaintiff's symptoms and discharging her with no real appreciation for the precipitating pathology;

l.   Failing to recognize the seriousness of and respond to the Plaintiff's deteriorating condition during the course of her stay after the injury;

m.   Failing to recognize that the Plaintiff's inability to ambulate would and in fact did lead to her laying in her own feces and urine resulting in a bladder infection and E. coli;

n.   Failing to monitor Plaintiff's condition to ensure she was properly assisted to prevent bladder infection and E. coli;

o.   Negligently telling the Plaintiff to return to her room without reasonable care from the medical facility;

p.   Negligently delaying consultation with an appropriate shoreside specialist(s) when the Plaintiff presented to the medical center in severe pain;

q.   Failing to timely obtain shoreside consultation with the appropriate medical expert(s) when the Plaintiff presented to the medical center in severe pain;

r.   Negligent supervision of the Medical Staff wherein the duty nurse dismissed the Plaintiff's concerns and instructed her to return to her cabin causing delay in treatment;

s.   Failing to provide competent medical staff capable of providing "full-time professional emergency medical attention" as advertised and guaranteed on Celebrity's website and as set forth in the Passenger Bill of Rights adopted by Celebrity;

t.   Failure to promptly provide Plaintiff with timely, proper and/or adequate medical care and attention;

u.   Failure to timely and/or properly assess and diagnosis Plaintiff and identify emergent, urgent condition of the Plaintiff in a timely manner, in order to facilitate optimum levels of health care;

v.   Failure to understand and react effectively to Plaintiff's medical needs given her symptoms to perform accurate and ongoing assessments of Plaintiff's condition;

w.   Failure to practice medicine according to generally accepted standards of care;

    x.  Failure to adhere and refer to Celebrity's policies and procedures;

    y.  Failure to adhere to industry standards including but not limited to the American College of Emergency Physicians Cruise Ship Guidelines;

    z.  A breach of the prevailing professional standard of care for said health care providers, to wit: that level of care, skill and treatment which, in light of all relevant surrounding circumstances as recognized as acceptable and appropriate by a reasonably prudent similar health care provider;

    aa. In other manners expected to be discovered during the course of ongoing investigation and discovery.

66. As a direct and proximate result of the negligence of the Medical Staff, as described above, the Plaintiff was unable to obtain the prompt, timely, proper and adequate medical care she required resulting in devastating injuries.   Had the Plaintiff received the appropriate care and treatment from the Medical Staff, it is more likely than not she would not have developed a bladder infection, E. coli, and extensive medical and rehabilitation care.

67. As a direct and proximate result of the negligence of the Medical Staff, the Plaintiff was injured in and about her body and extremities, including severe physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, disability, impairment, loss of past earnings and impairment of her future working ability and earning capacity,  inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions. All of these damages are permanent and continuing in nature.

68. As a further direct and proximate result of the negligence of the Medical Staff, the Plaintiff incurred medical expenses in the past and will continue to incur such expenses in the future. Plaintiff also lost the money paid for the cruise, incurred extra expenses such as transportation and had the enjoyment of the cruise ruined or damaged.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment against the CELEBRITY, for compensatory damages, interest, court costs, and all other relief recoverable under general maritime law or as this Court deems just and proper.

Dated:  December 5, 2019

LIPCON, MARGULIES,
ALSINA & WINKLEMAN, P.A.
*Attorneys for Plaintiff*
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone No.: (305) 373-3016
Facsimile No.: (305) 373-6204

By:  */s/ Stefanie A. Black*
**JASON M. MARGULIES**
Florida Bar No. 57916
jmargulies@lipcon.com
**STEFANIE A. BLACK**
Florida Bar No. 111903
sblack@lipcon.com